IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 27, 2021 Session

## STATE OF TENNESSEE v. ANDRE TERRY AND NOLANDUS SIMS

**Appeal from the Criminal Court for Knox County**
**No. 104542    Bobby R. McGee, Judge**

_____

**No. E2019-01741-CCA-R3-CD**

_____

In a joint trial, a Knox County jury convicted the defendants, Andre Terry and Nolandus Sims, of two counts of felony murder, one count of second-degree murder, two counts of attempted especially aggravated robbery, two counts of carjacking, one count of employing a firearm during a dangerous felony, two counts of aggravated robbery, and two counts of especially aggravated kidnapping. For the crimes, Defendant Terry received an effective sentence of life plus fourteen years, and Defendant Sims received an effective sentence of life plus fifteen years. On appeal, the defendants separately challenge the sufficiency of the evidence supporting their convictions and the introduction of gang-related evidence during trial. Defendant Terry also challenges the trial court's jurisdiction, suggesting the juvenile court failed to conduct a proper transfer hearing, and the trial court's denial of his numerous motions to sever. Following our review of the briefs, the record, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and TIMOTHY L. EASTER, JJ., joined.

Wesley D. Stone, Knoxville, Tennessee (at trial and on appeal), for the appellant, Andre Terry.

J. Liddell Kirk, Knoxville, Tennessee (on appeal) and Thomas G. Slaughter and Danny C. Garland, II, Knoxville, Tennessee (at trial), for the appellant, Nolandus Sims.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Charme P. Allen, District Attorney General; and TaKisha Fitzgerald and Phillip Morton, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## *Factual and Procedural History*

On November 30, 2013, the defendants, Andre Terry and Nolandus Sims, along with their two co-defendants, Antonio Marlin and Quantavious Williams, committed numerous crimes against two different victims.[1]  For crimes committed against Larry Mathis, the defendants were charged with two counts of carjacking (counts 6 and 7), one count of employing a firearm during the commission of a dangerous felony (count 8), two counts of aggravated robbery (counts 9 and 10), and two counts of especially aggravated kidnapping (counts 11 and 12).  Tenn. Code Ann. §§ 39-13-404; -17-1324; -13-402; -13-305.  The defendants then victimized Jack Hutchins which resulted in his death.  For these crimes, the defendants were charged with two counts of felony murder (counts 1 and 2), one count of first-degree premeditated murder (count 3), and two counts of attempted especially aggravated robbery (counts 4 and 5).[2]  Tenn. Code Ann. §§ 39-13-202; -12-101; -13-403.

## I.  *Juvenile Court Proceedings*

Defendant Terry was fifteen years old when he committed the crimes at issue.  As such, his case began in the Knox County Juvenile Court after delinquency petitions were filed against him for the attempted especially aggravated robbery and first-degree murder of Mr. Hutchins.  Co-defendant Williams was also a juvenile, and thus, the Juvenile Court Judge conducted a consolidated transfer hearing on November 21, 2014, to determine if Defendant Terry and Co-defendant Williams should be transferred to criminal court to be tried as adults.  Jerome Diaz, Investigator Brian Moran, and Detective Thomas Walker testified at the transfer hearing.

Mr. Diaz was friends with and lived near Mr. Hutchins.  On the evening of November 30, 2013, Mr. Diaz heard approximately five or six gunshots, opened his front door, and saw two men running past his home.  Mr. Diaz made eye contact with one of the men whom he identified as Defendant Terry during the transfer hearing.  Mr. Diaz then saw Mr. Hutchins lying in the street with several gunshot wounds.  When the police arrived, Mr. Diaz informed them of the direction he saw the men running and later identified Defendant Terry in a photographic lineup.

---

[1] As will become clear throughout this opinion, Co-defendant Williams's case was severed from the defendants while Co-defendant Marlin testified against the defendants at trial.

[2] In counts 13 through 17, the defendants were also indicted under the criminal gang offense enhancement statute but these charges were dismissed prior to trial.

Knoxville Police Department Investigator Brian Moran responded to the scene where he spoke with Mr. Diaz and others and learned Mr. Hutchins had passed away. As the investigation progressed, Investigator Moran received a tip which ultimately led him to present a photographic lineup to Mr. Diaz that included Defendant Terry's picture, and Mr. Diaz identified Defendant Terry in the lineup. Investigator Moran also surveilled Co-defendant Williams, took him into custody, and obtained a statement from him. Initially, during the statement, Co-defendant Williams denied being involved in the shooting. However, Co-defendant Williams ultimately admitted his involvement and in doing so, incriminated Defendants Terry and Sims.

Investigator Moran further testified about the details of Co-defendant Williams's statement. Defendant Terry objected throughout the testimony, arguing the testimony violated his right to confrontation. The State argued Co-defendant Williams's statement was being offered against Co-defendant Williams, not Defendant Terry, but admitted the statement incriminated Defendant Terry. The juvenile court overruled Defendant Terry's objections and allowed Investigator Moran to continue his testimony.

In doing so, Investigator Moran stated Co-defendant Williams admitted to being in the car with the defendants before, during, and after the shooting. He stated that the defendants were performing "randoms," or random robberies, as part of Co-defendant Williams's initiation into the "Rollin' 20's Crips." As it related to Mr. Hutchins, Co-defendant Williams explained Defendants Terry and Sims exited the car with .380 caliber handguns, the car circled the block, and then Co-defendant Williams saw a body in the street surrounded by blood. Defendants Terry and Sims got back into the car and made statements wherein they admitted that while attempting to rob Mr. Hutchins, Mr. Hutchins reached into his truck, and the defendants shot him.

The juvenile court also allowed Investigator Moran to testify about the statement he obtained from Defendant Sims. After Defendant Terry's numerous objections, the juvenile court noted this testimony was permitted for the limited purpose of corroborating Co-defendant Williams's statement. Investigator Moran then testified that Defendant Sims told him that he was driving around with Co-defendant Williams and Defendant Terry in order to commit random robberies. Defendant Sims and Defendant Terry got out of the car and approached Mr. Hutchins. Defendant Terry pointed a gun at Mr. Hutchins, and when Mr. Hutchins reached into his truck, Defendant Terry shot him. Defendant Sims told Investigator Moran that "[Defendant] Terry emptied the rest of his gun into" Mr. Hutchins. Investigator Moran reviewed Co-defendant Williams and Defendant Terry's Facebook accounts, identified the two men in photographs, and identified both men during the hearing. The juvenile court did not allow Investigator Moran to testify regarding Co-defendant Marlin's statement.

- 3 -

Detective Thomas Walker of the Knox County Sheriff's Office Gang Unit testified about the history of the Rollin' 20's Crips, including the specific hand gestures used and colors worn by the gang. Defendant Terry objected to Detective Walker testifying as an expert, and the juvenile court limited Detective Walker's testimony to lay opinion, noting the State failed to properly notify the defense of its intent to offer expert testimony at the hearing.

Finally, the State sought to introduce Mr. Hutchins's autopsy report into evidence. Defendant Terry objected, arguing the report violated the rule against hearsay, and the juvenile court sustained the objection. After its consideration of the arguments of the parties and the evidence presented, the juvenile court ordered Defendant Terry to be transferred to criminal court to be prosecuted as an adult.[3]

## II. Trial Proceedings

Upon transfer, the grand jury indicted the defendants for the above-listed crimes on December 2, 2014. Defendant Terry filed a motion for an acceptance hearing which was summarily denied by the trial court pursuant to Tennessee Code Annotated section 37-1-159(d), which permits an acceptance hearing in the trial court "[i]f and only if a nonlawyer judge presides at the transfer hearing in juvenile court."[4] Tenn. Code Ann. § 37-1-159(d).

Defendant Terry then filed a motion to dismiss the indictment on January 25, 2016. The motion to dismiss relied primarily on Defendant Terry's assertion that the juvenile court improperly transferred him to criminal court by "permit[ing], over [Defendant] Terry's objections, the violation of both [Defendant] Terry's statutory and constitutional rights to confront and cross-examine witnesses against him." Defendant Terry argued the transfer was improper pursuant to Tennessee Code Annotated section 37-1-127, which provides a party the opportunity to cross-examine adverse witnesses and states that "[a]n extra-judicial statement, if obtained in the course of violation of this part or that would be constitutionally inadmissible in a criminal proceeding, shall not be used against the child." Tenn. Code Ann. § 37-1-127(c).

After a hearing, the trial court denied Defendant Terry's motion to dismiss the indictment, and Defendant Terry filed an application for permission to pursue an interlocutory appeal regarding the denial. Defendant Terry continued to argue the transfer hearing was improper and as a result, the trial court "lacked both subject matter and personal jurisdiction regarding [Defendant] Terry and regarding these allegations due to

---

[3] The juvenile court also transferred Co-defendant Williams to criminal court.

[4] In denying the motion, the trial court took judicial notice of Knox County Juvenile Court Judge Timothy Irwin's status as a licensed attorney.

the improperly conducted transfer hearing wherein numerous constitutional [and] statutory violations occurred." The trial court granted Defendant Terry permission to file an interlocutory appeal pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure. Tenn. R. App. 9(a)(1). After timely pursing the application for permission to appeal, this Court denied the same.

During these proceedings, the State filed a motion to sever the defendants pursuant to Rule 14 of the Tennessee Rules of Criminal Procedure, noting it was unable to effectively redact the statements made to law enforcement by Co-Defendants Williams, Sims, and Marlin so as not to violate *Bruton*. *See Bruton v. United States*, 391 U.S. 123 (1968). After a hearing, the trial court severed Co-defendant Williams from Defendants Terry and Sims, and the two proceeded to trial on March 22, 2017, where the following proof emerged.

At the outset of trial, the State presented the audio recordings of the 911 calls made on November 30, 2013, in relation to the crimes at issue. Five of the calls related to Mr. Hutchins and one call related to Mr. Mathis. The recordings were presented by Michael Alan Mays, the custodian of records for the Knox County Emergency Communications District, who compiled the disc containing the six 911 calls based upon the Computer-Aided Dispatch ("CAD") Report generated for November 30, 2013. The CAD report and the calls were entered into evidence.

Larry Mathis, a substitute teacher and inner-city pastor, testified regarding the crimes committed against him on November 30, 2013. Around 8:00 p.m., Mr. Mathis went to his church in Knox County, Tennessee, "check[ed] the thermostat," and returned to his vehicle to listen to a ball game on the radio. Mr. Mathis indicated on a map of the area where his vehicle, a 2005 Escalade, was parked at the time and explained that because "[t]he gear cable had kinked, [] you had to put [the vehicle] in neutral to start it."

While sitting in his vehicle, "somebody" knocked on the window of the driver's door. When Mr. Mathis looked out the window and rolled it down, a man pointed a gun at him and stated, "'you know what to do.'" Mr. Mathis initially thought it was a joke as he knows many young men in the neighborhood. However, Mr. Mathis saw that the man's "[f]inger [was] on the trigger" and stated the gun was approximately two feet from him. Mr. Mathis then saw another man "with his gun pointed as well," standing behind the passenger seat on the driver's side of the vehicle. Mr. Mathis described the man at the driver's side window as a "tall, fair-skinned" black man who "had short hair at the time" and "[k]ind of a baby face." Mr. Mathis calmly explained to the men who he was and what he did, telling them they did not want to "do this." However, the man near the driver's seat "forced" Mr. Mathis out of his vehicle and demanded his cell phone, wallet, and keys. The

man told Mr. Mathis to "get out and get on the ground and don't move" and threatened to shoot him if he did. Mr. Mathis complied and lay face down in the grass next to his vehicle.

While Mr. Mathis was on the ground, the men got into his vehicle and attempted to start it but were unsuccessful. The men made Mr. Mathis "get back up, put it in gear, start it, and then get back out and get back on the ground." Mr. Mathis stated that when he entered the vehicle to start it, the men did not have guns pointed at him; however, "they had already threatened to shoot me[.] . . . So I just did what I was told to do." The men ordered Mr. Mathis to the ground a second time before driving away in his vehicle. Mr. Mathis indicated the direction the men drove on a map of the area.

Mr. Mathis then walked to a nearby friend's house and called the police. When the police responded to the scene, Mr. Mathis returned and told them that he did not think the men were from the area. Mr. Mathis explained that he knows most of the young men in the area but the men who attacked him "didn't know who [he] was," and they had a "Chattanooga accent." Police attempted to locate Mr. Mathis's vehicle using its GPS tracking but were unsuccessful as the system was not in service. Mr. Mathis stated the men took his vehicle, keys, cell phone, wallet, and the mail that was inside his vehicle. Though Mr. Mathis recovered his vehicle, keys, and mail the following day, he did not recover his wallet or cell phone. Mr. Mathis was not physically injured during the encounter.

On two occasions during the investigation, Mr. Mathis reviewed photographic lineups but was unable to identify the men who attacked him. Mr. Mathis stated the lineups presented to him consisted primarily of older men whereas the men who attacked him were young. Mr. Mathis was not shown a photographic lineup that included Co-defendant Sims's picture but testified that Co-defendant Sims looked like one of the men who attacked him "but he looks a lot older." During redirect examination, Mr. Mathis stepped down from the witness chair in order to get a closer look at the defendants. After doing so and over Defendant Terry's objections, Mr. Mathis stated "[T]hey both look like the gentlemen."[5]

After Mr. Mathis's testimony, Defendant Terry moved to sever pursuant to Rule 14 of the Tennessee Rules of Criminal Procedure which permits severance "when the court finds a severance is necessary to achieve a fair determination of the defendant's guilt or innocence of each offense." Tenn. R. Crim. P. 14(b)(2)(B). In support, Defendant Terry relied on a statement made during opening arguments by the State regarding the truthfulness of Defendant Marlin, the "in-court show-up identification" of Defendant Terry by Mr. Mathis, and the introduction of the "cruiser video" played during Mr. Mathis's

---

[5] During his testimony, the State played an additional recording identified as a "cruiser video" which showed Mr. Mathis after the attack.

testimony. The trial court denied the motion to sever, and the State continued with its case-in-chief, directing its focus to the crimes committed against Mr. Hutchins.

Co-defendant Marlin stated he is from Chattanooga, is 20 years old, and is a member of the Rollin' 40's Crips.[6] In November 2013, Co-defendant Marlin planned to visit Co-defendant Williams in Knoxville with Defendant Sims, Defendant Terry and Kyhree Thompson. According to Co-defendant Marlin, Defendant Sims, Defendant Terry, Co-defendant Williams, and Mr. Thompson were members of the Rollin' 20's Crips. Co-defendant Marlin explained that while all of the men are Crips, they are members of "[d]ifferent sets, different hoods" who have different business, and thus, Co-defendant Marlin needed permission to attend the Knoxville trip. As a result, during a phone call, Defendant Sims asked Co-defendant Williams if Co-defendant Marlin could attend, permission was granted, and Co-defendant Marlin traveled to Knoxville with Mr. Thompson and Defendants Terry and Sims. Defendant Sims drove a vehicle of Defendant Terry's, and Co-defendant Marlin stated no one had a weapon.

Upon arriving in Knoxville, the men went to Co-defendant Williams's home, "chilled out" with Co-defendant Williams's family, and went to the mall and Walmart. The group included, amongst others, the defendants and co-defendants along with Mr. Thompson, Ralph Bell, and "Hot Boy." The next day, Co-defendant Williams stated that he needed money, and Co-defendant Williams, Defendant Terry, Defendant Sims and others went into another room and had a meeting. Co-defendant Marlin did not know what was discussed and was not privy to the meeting because he was not a member of the Rollin' 20's Crips. When the meeting ended, the group got into a car and rode around. The group consisted of Co-defendant Marlin, Co-defendant Williams, Defendant Terry, Defendant Sims, Hot Boy, and Mr. Bell. Mr. Bell drove, Co-defendant Williams sat in the front passenger seat, and Co-defendant Marlin sat in the middle of the backseat with Defendants Terry and Sims on either side. Hot Boy and Mr. Thompson rode in the back of the vehicle.[7] Co-defendant Marlin saw Defendants Terry and Sims with weapons but stated he did not have a gun.

Co-defendant Marlin assumed Co-defendant Williams needed money "for some gang purpose" and stated he joined for the car ride "[b]ecause they told me to come along, so I came along." Regarding the group's plans, Co-defendant Marlin stated, "I knew there

---

[6] Prior to Co-defendant Marlin's testimony, the defendants objected to the introduction of gang-related evidence. Outside the presence of the jury, the trial court heard the proposed testimony from the State and after arguments from the parties, overruled the defense objections. During this discussion, Defendant Terry again moved for severance which was denied by the trial court.

[7] We acknowledge Co-defendant Marlin's testimony about who was in the vehicle was inconsistent as it related to Mr. Thompson and Mr. Bell.

was weapons and they said they needed money, so I knew something was going to happen. I didn't know it was going to be nothing serious, but I knew it was going to be a way to make money." More specifically, Co-defendant Marlin explained that the crimes committed against Mr. Mathis and Mr. Hutchins were "randoms," stating that "[r]andoms is where you just ride and see somebody that you think they have money and rob them." Co-defendant Marlin then detailed the "randoms" committed against Mr. Mathis and Mr. Hutchins.

The group drove to the Woodbine area where they saw Mr. Mathis packing items into his "expensive Escalade car," and Defendants Terry and Sims exited their vehicle armed with guns. Co-defendant Marlin stated no one else exited the vehicle, "so I figured the[re] was something violent fixing to happen." Defendants Terry and Sims then "took [Mr. Mathis] at gunpoint, placed him on the ground[,] and took off in his vehicle." Co-defendant Marlin saw Mr. Mathis "[p]ut his hands up, get on the ground[,] and stayed there." The vehicle Co-defendant Marlin was in followed Defendants Terry and Sims who were driving Mr. Mathis's vehicle. When Defendants Terry and Sims discarded Mr. Mathis's vehicle, they reentered the vehicle Co-defendant Marlin was in, and the group went to Townview Towers. Regarding Mr. Mathis's vehicle, Co-defendant Marlin stated Defendants Terry and Sims "didn't want the car anymore."

The group then "chilled out" for 30 to 45 minutes at Townview Towers before returning to the Woodbine area. Co-defendant Marlin explained "[w]e rolling down the street and we seen [Mr. Hutchins], and [Defendant] Sims and [Defendant Terry] got out of the car." At the time, Mr. Hutchins was getting "groceries or something" out of his truck. When Defendants Terry and Sims exited the vehicle, they both carried guns. The group who remained in the car "rode up the street and turned and parked on the corner," and Co-defendant Marlin understood that Mr. Hutchins "was going to get robbed."

However, Co-defendant Marlin soon heard gunshots, and the group "started driving. We went around the corner and we seen [Mr. Hutchins] covered in blood, laying (sic) on the ground." Co-defendant Marlin saw Defendants Terry and Sims running, and the group picked them up and returned to Co-defendant Williams's home. There, Defendant Sims stated "that he shot because [Mr. Hutchins] was reaching into his car," and Defendant Terry "said he shot 'cause [Mr. Hutchins] was reaching into the car."

Co-defendant Marlin then detailed his participation in the investigation that followed. On June 6, 2014, Co-defendant Marlin was in custody and provided a recorded interview to Investigator Moran. Co-defendant Marlin signed a waiver of rights which was entered into evidence. He also reviewed several photographic lineups and identified Defendant Sims, Defendant Terry, Co-defendant Williams, Mr. Thompson, and Mr. Bell in the lineups. Co-defendant Marlin provided the nicknames of the men, stating:

Defendant Terry's nickname is "Evil D;" Defendant Sims's nickname is "Lil 20 C;" Co-defendant Williams's nickname is "Lil Rich Rollin;" Mr. Thompson's nickname is "Gold Flag;" and Mr. Bell's nickname is "Too Evil."

Co-defendant Marlin reviewed photographs taken at Co-defendant Williams's home when the group arrived in Knoxville. In the photographs, Co-defendant Marlin identified himself, Defendant Terry, Defendant Sims, Co-defendant Williams, Mr. Thompson, Mr. Bell, Hot Boy, Co-defendant Williams's sister, and Co-defendant Williams's girlfriend, Deshaunte Dompier. In the photographs, each person was holding up hand signs "[t]o signify that we are gang members." Co-defendant Marlin explained he was holding up "[f]our fingers and two fingers and a thumb" to signify his membership in the Rollin' 40's Crips while the others are holding up "two fingers, fist, three fingers, one finger" to signify "that they are 20 Crips gang members." Co-defendant Marlin indicated the colors worn in the photograph are yellow, black, and blue, the colors of the Rollin' 20's Crips. He explained the Rollin' 20's Crips and the Rollin' 40's Crips are "different branches, different hoods, different sets," noting that a "[h]ood is just like set, just short phrase, or just breaking down different gangs." He also stated that performing "randoms" is a way to prove "that you can be down, that you tough."

Finally, Co-defendant Marlin testified that for his participation in the crimes, he is facing charges for first-degree murder, carjacking, especially aggravated robbery, unlawful possession of a firearm, and felony murder. He explained that in exchange for truthful testimony, he had received an offer of twenty years of supervised probation for the charges. Co-defendant Marlin stated that he was facing 51 years in prison absent the deal and that he previously pled guilty to facilitation of aggravated burglary. Co-defendant Marlin also admitted to initially lying to police by denying being present for the crimes. Furthermore, he confessed that the Rollin' 40's Crips sell drugs and rob people.

Investigator Moran led the investigation into Mr. Hutchins's death after responding to the scene with his partner, A.J. Loeffler. Upon arrival, Investigator Moran found Mr. Hutchins in an ambulance and patrol officers securing the scene. When Mr. Hutchins was transported to the hospital, Officer Loeffler followed, and Investigator Moran remained on the scene where he spoke with witnesses, initiated a canvassing of the neighborhood, and called for crime lab technicians. While canvassing the neighborhood, officers encountered two witnesses, Jerome Diaz and Christopher Lee Estes, who provided that they saw "two younger gentlemen fleeing from the scene after hearing what they [thought] was gunshots." Investigator Moran interviewed Mr. Diaz on several occasions, presented photographic lineups to him, and took a recorded statement from him. Both Mr. Diaz and Mr. Estes testified during trial.

Mr. Diaz and Mr. Estes lived on the same street as Mr. Hutchins and his girlfriend, Beth Dompier. On a map displayed for the jury, Mr. Estes identified his home, Mr. Diaz's home, and Mr. Hutchins's home. Prior to the shooting, Mr. Estes was washing dishes when he "heard a couple of pops." He looked out the window and saw taillights. When he went downstairs to "poke[] [his] head out," Mr. Estes "saw two people -- two black figures" jogging down the street. Mr. Estes did not see or hear anything else and went back inside. Approximately five to ten minutes later, Mr. Estes's son told him an ambulance and the police were outside, and Mr. Estes heard Ms. Dompier "scream that they shot him." Mr. Estes provided police with a description of the "kids that [he] saw running away," describing them as "two kids, black figured. One had a sweater on under a -- looked like a glossy leather jacket with a hood on it. The other one just had a regular throw-on sweater on." During his testimony, Mr. Estes detailed the path he saw the individuals take on a map of the area.

Mr. Diaz stated Mr. Hutchins was his best friend and neighbor. In 2013, Mr. Hutchins lived with Ms. Dompier and between the two, had eight children. Mr. Diaz knew the children, including Deshaunte "TayTay" Dompier, who was dating Co-defendant Williams at the time. Prior to the shooting, Mr. Diaz was in his living room when he "heard some pops, like, firecrackers." He looked outside through the kitchen window, front door, and back door. When he did not see anything, Mr. Diaz went back to the front door and saw "two guys running past my door. One of the guys was already past my door, but the one in the back actually looked at me." Mr. Diaz described the man who was already past his door as "a young man, he had braids, and he was dark" and stated he "kind of recognized" the man with whom he made eye contact. As the men ran by, Mr. Diaz still thought the pops he heard were "just kids playing," but he soon heard a scream and saw Ms. Dompier and Mr. Hutchins on the ground. "[T]hat's when [he] realized that it was the boys" that had just run past his house. Mr. Diaz called the police and attempted to follow the men in his vehicle.

When Mr. Diaz was unable to locate the men, he returned to the scene where he saw Mr. Hutchins's body covered in blood "in between the truck – like, he was coming out of his truck" and McDonald's drinks on the hood of the truck, "like he was trying to get something, and get it and go in the house." Mr. Diaz believed that Mr. Hutchins had been "shot in the head and in a couple other spots." An ambulance arrived, began "working" on Mr. Hutchins, and then took Mr. Hutchins from the scene. Mr. Diaz spoke with Investigator Moran, stating that two men ran past his home and that he could identify the man with whom he made eye contact. Mr. Diaz subsequently reviewed several photographic lineups, and in one lineup, which contained Defendant Terry's picture, identified Defendant Terry as the person he saw "[r]unning in front of my house, and he turned and looked at me." The photographic lineup, wherein Defendant Terry's picture was circled and signed by Mr. Diaz on January 4, 2014, was entered into evidence. Mr.

Diaz marked on a map of the area where Defendant Terry was when Defendant Terry turned and looked at Mr. Diaz. Mr. Diaz testified that he had also testified in juvenile court and identified Defendant Terry as the man he saw run past his home. Mr. Diaz then identified Defendant Terry during trial, noting he had gained weight, was wearing glasses, but his "hair looks familiar."[8]

During cross-examination, Mr. Diaz stated he did not see Defendant Sims the night of the shooting. He described the first man further stating though he did not see the man's face, the man was "a little darker" and had "some type of dreads." Mr. Diaz noted that neither man said anything as they ran past his home. During redirect examination, the State introduced two prior identifications of Defendant Terry made by Mr. Diaz during Defendant Terry's transfer hearing and a recorded interview with Investigator Moran on April 2, 2014. Portions of the interview and transfer hearing wherein Mr. Diaz identified Defendant Terry were presented to the jury.

Investigator Moran provided additional details of his investigation into the crimes, stating while still on the scene, he learned that Mr. Hutchins had died. He also received an additional 911 call regarding the carjacking involving Mr. Mathis. However, Investigator Moran did not initially put the two crimes together. Investigator Moran stated Co-defendant Williams's home was approximately two minutes driving distance from Mr. Hutchins's home.

The following day, Investigator Moran attended the autopsy of Mr. Hutchins who had four bullets in his body and had suffered multiple gunshot wounds. Additionally, the investigation revealed that prior to the shooting, Mr. Hutchins was picking up dinner for his family from McDonald's and Arby's. Investigator Moran obtained surveillance footage from Arby's which was retrieved by Jeff Lloyd, an employee of TGJ & Company, the company that owned Arby's. Mr. Lloyd identified the DVD he created of the surveillance footage which was entered into evidence.

Investigator Moran testified that the investigation progressed after he received a tip from a Knox County juvenile corrections officer. The tip led Investigator Moran to interview Kendall Garner at Mountain View Juvenile Detention. After interviewing Mr. Garner, Investigator Moran created two photographic lineups, one of which included Defendant Terry's picture. The photographic lineup was presented to Mr. Diaz and, as previously discussed, Mr. Diaz identified Defendant Terry as the man he saw running past

---

[8] Mr. Diaz first testified that he saw Co-defendant Williams run past his home but explained he was incorrect about the defendants' names, providing that he initially stated he saw Co-defendant Williams because "I heard that name here, so I just thought that was his name, you know. I don't know."

his house.  Investigator Moran showed Mr. Diaz a second photographic lineup that included Co-defendant Williams's picture, but Mr. Diaz was unable to make an identification.

Investigator Moran then interviewed Co-defendant Williams and Dashante Dompier on March 5, 2014.  Co-defendant Williams "eventually confessed" to his participation in the crimes and provided "additional names."  These interviews led Investigator Moran to locate and interview Defendant Sims on March 11, 2014.  The interview was recorded, portions of which were entered into evidence and played for the jury.  Defendant Sims's signed waiver of rights was also entered into evidence.

During the interview, Defendant Sims explained that the robbery attempt of Mr. Hutchins was "random" and provided details about the crimes like the type of truck Mr. Hutchins drove, where Mr. Hutchins was, what Mr. Hutchins had with him when they approached him, and the type of gun used, a .380 semiautomatic handgun.  Additionally, in reference to the shooting of Mr. Hutchins, Defendant Sims "acknowledge[d] shooting twice."  Defendant Sims also noted he wore dreads at the time of the shooting, detailed his actions after the shooting, and explained why he had a handgun.  Finally, Investigator Moran interviewed Co-defendant Marlin on June 6, 2014, attempted to interview Mr. Bell but was unable to because Mr. Bell was out of the country, and stated that he was unable to obtain permission from Defendant Terry's mother in order to interview him.  For the crimes committed, Investigator Moran ultimately filed petitions in juvenile court against Defendant Terry and Co-defendant Williams and participated in their transfer hearings.

Regarding the crimes committed against Mr. Mathis, Investigator Moran acknowledged that a photographic lineup containing Defendant Terry's picture was presented to Mr. Mathis on February 28, 2014, but Mr. Mathis was unable to identify anyone in the lineup.  Investigator Moran was unsure if Mr. Mathis's cell phone was in the vehicle upon its recovery but thought Mr. Mathis did recover his wallet.  Investigator Moran agreed there was no physical evidence linking Defendant Terry to the crimes against Mr. Hutchins or Mr. Mathis.

During cross-examination, Investigator Moran stated he did not believe that the group's sole purpose for being in Knoxville was to visit as stated by Co-defendant Marlin.  However, Investigator Moran believed Co-defendant Williams when he provided during his interview that the group was in Knoxville to initiate him into the Rollin' 20's Crips.  Investigator Moran did not know if Co-defendant Marlin was aware of the initiation plan.  Investigator Moran acknowledged Co-defendant Marlin testified that Co-defendant Williams was in charge of the events and that Defendant Sims stated he did not shoot at Mr. Hutchins but rather shot into the air.  Investigator Moran also acknowledged that the version of events provided by Co-defendants Marlin and Williams did not match "100 percent."  When asked if he believed Co-defendant Marlin was "wholly forthcoming,"

Investigator Moran stated: "Not wholly. I mean, you know, he did reference doing [']randoms['] to prove yourself to a gang, which, in essence, is kind of similar to what [Co-defendant] Williams said, but not 100 percent, you're correct." No weapons were recovered though Investigator Moran indicated "two people" stated the weapons "were dropped off in Townview Towers." Investigator Moran also noted Co-defendant Marlin was the only person involved who was not a member of the Rollin' 20's Crips.

During redirect examination, Investigator Moran stated Co-defendant Marlin's statement "pretty much fit" with his investigation into the crimes, noting he "had confirmed what other people had told us." Regarding who exited the vehicle, Investigator Moran stated in reference to Defendants Terry and Sims, "on the night of the murder on the incidents of the murder, the only evidence we ever got in statements was those two individuals were the ones that got out with guns."

Beth Dompier testified regarding her perspective on the night Mr. Hutchins's was shot. In 2013, she lived on Woodbine Avenue with her mother and Mr. Hutchins, with whom she shared a blended family of nine children. Ms. Dompier explained she raised her stepdaughter Deshaunte Dompier, identified her in a picture, and stated Deshaunte Dompier dated Co-defendant Williams. Prior to the shooting, Ms. Dompier wrote out the family's dinner order and provided the order to Mr. Hutchins who went to Arby's and McDonald's to fulfill the requests. The State played the video footage obtained from Arby's, and Ms. Dompier identified Mr. Hutchins in the video.

Ms. Dompier explained that as she was watching television in the living room, she heard Mr. Hutchins's truck pull up to the house. She then heard gunshots that sounded close to the home and realized she had not heard Mr. Hutchins shut the door to his truck. However, when she went to the window to look outside, she did not see anything unusual. Ms. Dompier then opened the front door and saw drinks sitting on the front of the truck and the driver's side door open but did not see Mr. Hutchins. Ms. Dompier ran to the truck and found Mr. Hutchins on the ground, "moving, [and] twitching." She saw "blood gurgling in his mouth," which was blocking his ability to breathe, and attempted to clear his airway. Ms. Dompier's mother called 911, and Ms. Dompier remained with Mr. Hutchins until the police and paramedics arrived. Ms. Dompier identified Mr. Hutchins in a photograph which was entered into evidence.

Knoxville Police Department crime scene and evidence technicians Danielle Wieberg and Rebecca Taylor participated in the investigation into the shooting. Ms. Wieberg photographed the scene and the evidence collected and created a diagram, all of which were entered into evidence and described at trial. The photographs showed the interior and exterior of Mr. Hutchins's truck, which had blood spots in various locations, food inside, and drinks on top. The photographs also showed cartridge casings, a bullet,

and a cigarette found on the scene. In addition, Ms. Wieberg presented the physical evidence collected on the scene, including a partially smoked cigarette, a stocking cap, and eyeglasses. The firearms evidence included a deformed bullet fragment and six .380 cartridge casings manufactured by "RP." Most of the cartridge casings were found near the door of Mr. Hutchins's truck. The truck was not processed for fingerprints as "[i]t did not appear that anyone other than the victim had been in the vehicle."

Ms. Taylor also responded to the hospital to collect evidence and photograph Mr. Hutchins. When Ms. Taylor saw Mr. Hutchins, he had already died, his clothing had been removed, he had several injuries "which looked [] like bullet wounds on his chest and his arms" and his back, and his head and hair were saturated with blood. Ms. Taylor photographed Mr. Hutchins and his injuries, noting she observed "what appeared to be bullet wounds on his left upper chest, two in his center chest, one in his right arm[,] and one in his left knee." Ms. Taylor saw bullet holes in Mr. Hutchins clothing that corresponded with the wounds she observed. Ms. Taylor reviewed the clothing collected from the hospital and confirmed it was the clothing she photographed. Ms. Taylor also photographed $22 found in Mr. Hutchins's pocket, a receipt from Arby's found on Mr. Hutchins and dated November 30, 2013 at 8:22 p.m., and "a list-drawn envelope that had food items from McDonald's and Arby's written on it."

Patricia M. Resig of the Knoxville Police Department testified as an expert in firearms identification. Ms. Resig examined six .380-auto caliber casings related to the shooting. Five of the casings displayed class characteristics that were consistent with one another while the sixth casing was similar but not consistent with the other five. As a result, Ms. Resig opined "that there were two .380 auto caliber guns that were fired." Ms. Resig also examined four fired .380 auto caliber bullets recovered from Mr. Hutchins' body during the autopsy and "determined that they were fired through the same barrel." A copy of Ms. Resig's report was entered into evidence.

Detective Thomas Walker of the Knox County Sheriff's Office Gang Intelligence Unit testified as an expert in gang investigation and identification. After providing a general history of the Rollin' 20's and Rollin' 40's Crips, Detective Walker explained the Knoxville-area Crips engage in "drug dealing, robberies, home invasions, murders, drive-by shootings. Pretty much any typical gang crime you can think of, they've committed." Detective Walker defined "randoms" as:

> Randoms, it's when they don't have a specific plan. They haven't, like, picked out somebody specific they're going to rob. They go out and they find just whoever's available. So it's called randoms for random crimes. So if they see a target of opportunity, they're going to stop and do whatever

crime they're going to do, home invasion, carjacking, robbery, what have you.

He defined "hood" as the "area of town" a gang member is from or the "area of town that they feel comfortable in or call their area." He also noted members of the Rollin' 20's Crips can associate with members of the Rollin' 40's Crips, but members of different gangs are not typically privy to the other gang's meetings as members "want to keep their -- their individual gang meetings as close-knit as possible. They probably would not allow a rival gang member to be involved in their meetings."

Upon the State's request and following research, Detective Walker testified that Defendants Sims and Terry and Co-defendant Williams were members of the Rollin' 20's Crips with the following nicknames: Defendant Sims was also known as "Hatch Boy"; Defendant Terry was also known as "Evil D"; and Co-defendant Williams was also known as "Lil Rich Rollin'." Detective Walker stated Co-defendant Marlin is a member of the Rollin' 40's Crips with the nicknames "C Rider" or "Yellow Boy." Detective Walker identified the gang affiliation indicators as seen in a picture of the defendants and co-defendants which was previously entered into evidence, noting, amongst other things, "multiple individuals are wearing Pittsburgh Steeler sports memorabilia. That is the colors and symbols that the Rollin' 20[']s Crips wear. The hand signs they're throwing are the two fingers for two and then they're holding their fist, which would be the zero, so it'd be 2-0, 20[']s, for Rollin' 20[']s." Detective Walker noted Co-defendant Marlin gestured "40" with his hands.

Dr. Christopher Lochmuller, an expert in anatomic, clinical, and forensic pathology, performed the autopsy of Mr. Hutchins on December 1, 2013. Numerous photographs taken during the autopsy were entered into evidence and presented to the jury during Dr. Lochmuller's testimony. Dr. Lochmuller explained Mr. Hutchins was shot five times, noting two of the bullets reentered his body which resulted in seven entrance wounds. Dr. Lochmuller identified wounds to Mr. Hutchins' right arm, right side of the chest, right side of the upper back, right side of the back, left knee, left side of the lower back, and left hip. Four bullets were recovered during the autopsy from "just under the skin of the left flank," the left knee, the right buttock, and the left buttock. Using a mannequin as a demonstrative aide, Dr. Lochmuller demonstrated the trajectories of the bullets that struck Mr. Hutchins. Dr. Lochmuller ruled the cause of death to be multiple gunshot wounds and the manner of death to be a homicide. Knoxville Police Department Officer Edward Johnson retrieved the evidence from the medical examiner which included the bullet fragments and clothing recovered from Mr. Hutchins during the autopsy. The State then rested its case.

Both defendants moved for a judgment of acquittal, the trial court denied the motions, and neither defendant presented any proof. After deliberating, the jury convicted

- 15 -

the defendants of two counts of first-degree felony murder (counts 1 and 2), second-degree murder (count 3), two counts of attempted especially aggravated robbery (counts 4 and 5), two counts of carjacking (counts 6 and 7), employing a firearm during a dangerous felony (count 8), two counts of aggravated robbery (counts 9 and 10), and two counts of especially aggravated kidnapping (counts 11 and 12). For the crimes, the trial court sentenced Defendant Terry to life with the possibility of parole plus fourteen years and Defendant Sims to life with the possibility of parole plus fifteen years. After the trial court denied the defendants' motions for a new trial, the defendants timely appealed, and this Court consolidated the appeals.

## *Analysis*

### I. *Defendant Terry's Transfer Hearing and Motion to Dismiss*

Defendant Terry argues the trial court erred in denying his motion to dismiss, asserting the trial court lacked jurisdiction over him because his transfer hearing did not conform to the requirements of Tennessee Code Annotated section 37-1-127. The State disagrees.

The applicable code sections provide that after a delinquency petition "based on conduct that is designated a crime or public offense under the law" has been filed, "the court, before hearing the petition on the merits, may transfer the child to the sheriff of the county to be held according to law and to be dealt with as an adult in the criminal court of competent jurisdiction." Tenn. Code Ann. § 37-1-134(a). "The disposition of the child shall be as if the child were an adult if . . . [t]he child was . . . [f]ourteen (14) years of age or more but less than seventeen (17) years of age at the time of the alleged conduct and charged with the offense of" first-degree murder or especially aggravated robbery. Tenn. Code Ann. § 37-1-134(a)(1)(A)(ii). And, transfer should be made when "[t]he court finds that there is probable cause to believe that: (A) [t]he child committed the delinquent act as alleged; (B) [t]he child is not committable to an institution for the developmentally disabled or mentally ill; and (C) [t]he interests of the community require that the child be put under legal restraint or discipline." Tenn. Code Ann. § 37-1-134(a)(4). Upon transfer, the juvenile court is divested of jurisdiction "with respect to any and all delinquent acts with which the child may then or thereafter be charged, and the child shall thereafter be dealt with as an adult as to all pending and subsequent criminal charges" unless the child "is acquitted in criminal court on the charge or charges resulting in such transfer, or if such charge or charges are dismissed in such court." Tenn. Code Ann. § 37-1-134(c).

A hearing on whether the transfer is appropriate must conform to Tennessee Code Annotated sections 37-1-124, 37-1-126, and 37-1-127. Tenn. Code Ann. § 37-1-134(a)(2). The hearing "shall be conducted by the court without a jury, in an informal but orderly

- 16 -

manner." Tenn. Code Ann. § 37-1-124(a). And applicable to this appeal, during the hearing, a party is entitled to cross-examine adverse witnesses, and extra-judicial statements, "if obtained in the course of violation of this part or that would be constitutionally inadmissible in a criminal proceeding, shall not be used against the child." Tenn. Code Ann. § 37-1-127(a), (c).

Here, Defendant Terry asserts his transfer hearing violated the applicable statutes because the State "introduce[d] extrajudicial statements against him" and "any statement by a non-testifying co-defendant which incriminated [Defendant] Terry during the transfer hearing was constitutionally prohibited under *Bruton*." Defendant Terry also argues that "[t]he juvenile court's decision to allow Thomas Walker to rely upon hearsay information by giving expert testimony as a lay witness deprived [Defendant] Terry of his right to confront and cross-examine the declarants of that information." As a result, Defendant Terry asserts that because "the trial court lacked jurisdiction over [Defendant] Terry's case, the trial court erred when it refused to dismiss the presentment for want of jurisdiction." The State argues the trial court properly denied Defendant Terry's motion to dismiss because "when the juvenile court found reasonable grounds to believe Defendant Terry committed the delinquent acts as alleged, that he was not committable to an institution for the developmentally disabled or mentally ill, and that the interest of the community required that he be put under legal restraint or discipline, transfer to criminal court was mandatory." We agree with the State.

The record indicates delinquency petitions were filed against Defendant Terry for the first-degree murder and especially aggravated robbery of Mr. Hutchins. The juvenile court jointly conducted Defendant Terry's transfer hearing with Co-defendant Williams during which it heard testimony from Mr. Diaz, Investigator Moran, and Detective Walker. Mr. Diaz testified that after hearing gunshots on November 30, 2013, he looked out his front door and made eye contact with Defendant Terry, who was running past his home. Mr. Diaz then identified Defendant Terry in a photographic lineup and during the transfer hearing. Investigator Moran explained that after receiving a tip, he presented a photographic lineup to Mr. Diaz which included Defendant Terry's picture, and Mr. Diaz identified Defendant Terry in the lineup. Investigator Moran also conducted interviews with Co-defendant Williams and Defendant Sims and testified that during the interviews, both Co-defendant Williams and Defendant Sims admitted to being involved in the crimes committed against Mr. Hutchins. Further, Investigator Moran testified that Co-defendant Williams stated that Defendant Terry admitted to shooting Mr. Hutchins while attempting to rob him and Defendant Sims stated Defendant Terry shot Mr. Hutchins. Finally, Detective Walker provided lay opinion testimony regarding the specific gang-related colors and hand gestures used by the Rollin' 20's Crips, a gang in which Defendant Terry was a member.

- 17 -

At the conclusion of the hearing, the juvenile court found there were reasonable grounds to believe Defendant Terry committed the attempted especially aggravated robbery and murder of Mr. Hutchins through the "use of a .380 semiautomatic handgun," "is not committable to an institution for the mentally ill or mentally retarded," and "[t]he interest of the community requires that [Defendant Terry] be put under legal restraint or discipline." In reaching this conclusion, the juvenile court stated:

> First, and perhaps most damming to [Defendant] Terry's case was an eyewitness identification of him running from the scene right after the shooting. I believe that, without any statements made by [Co-defendant] Williams, or by [Defendant] Sims, . . . I believe that's enough for me to have reasonable grounds to believe that he was one of the two actual murderers.

Accordingly, the record makes clear that the juvenile court conducted a proper transfer hearing during which it heard testimony from Mr. Diaz that established probable cause that Defendant Terry committed the especially aggravated robbery and first-degree murder of Mr. Hutchins as alleged in the petitions. Additionally, the record indicates the juvenile court allowed Investigator Moran to testify about Co-defendant Williams's statement in order to establish probable cause that Co-defendant Williams committed the crimes as alleged. The juvenile court then admitted testimony from Investigator Moran regarding Defendant Sims's statement for the limited purpose of corroborating the statement made by Co-defendant Williams.

While it is clear the statements incriminated Defendant Terry, the record also makes clear the juvenile court found probable cause existed regarding Defendant Terry's participation in the especially aggravated robbery and first-degree murder of Mr. Hutchins based upon Mr. Diaz's testimony alone; Defendant Terry was not committable to an institution for the developmentally disabled or mentally ill; and the interests of the community required that Defendant Terry be put under legal restraint or discipline. This Court has previously held that "if there was probable cause to believe that the juvenile committed the crime and the evidence at the hearing showed that the defendant was not mentally impaired and should be legally restrained, a juvenile court judge's discretionary decision to allow a juvenile to be treated as an adult should not be disturbed on appeal." *State v. Mario A. Reed*, No. M2009-00887-CCA-R3-CD, 2010 WL 3432663, at *6 (Tenn. Crim. App. Aug. 31, 2010) (citation omitted). Further, nothing in the record indicates the juvenile court erred in transferring Defendant Terry to criminal court as the remaining statutory requirements were satisfied. Thus, jurisdiction was properly bestowed upon the trial court, and Defendant Terry cannot show that the trial court erred in denying his motion to dismiss which was based upon the alleged improper transfer. Tenn. Code Ann. § 37-1-134(c). Defendant Terry is not entitled to relief.

*II.     Sufficiency of the Evidence*

The defendants separately challenge the sufficiency of the evidence supporting their convictions.  When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).  All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact.  *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973).  Our supreme court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (1963)).  "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two.  *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)).  The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).  The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331,

335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

In support of his sufficiency argument as to each conviction, Defendant Terry challenges the credibility of Co-defendant Marlin but fails to provide any additional argument to support the challenge. Defendant Terry provides:

> The State of Tennessee's entire case against [Defendant] Terry was based upon the brokered testimony of [Co-defendant] Marlin. [Co-defendant] Marlin, a convicted felon, was charged with all of the offenses that [Defendant] Terry was charged with. [Co-defendant] Marlin was facing life in prison. However, [Co-defendant] Marlin received 20 years of supervised probation for his testimony against [Defendant] Terry.

We do not find this argument persuasive as this Court has repeatedly held that the jury determines the credibility of witnesses and the weight afforded to the evidence, and we do not reweigh the evidence or substitute our inferences for those drawn by the trier of fact. *Pappas*, 754 S.W.2d at 623. This Court presumes any conflicts in Co-defendant Marlin's testimony and the additional and overwhelming evidence presented by the State were resolved by the jury in reaching its verdict. *See Campbell*, 245 S.W.3d at 335; *State v. Adams*, 45 S.W.3d 46, 55 (Tenn. Crim. App. 2000). Defendant Terry is not entitled to relief.

Defendant Sims only challenges the sufficiency of the evidence supporting his conviction for the especially aggravated kidnapping of Mr. Mathis, arguing that "[t]he only 'confinement' that occurred during this incident was nothing more than incidental to the accomplishment of the aggravated robbery" as "the victim was not confined beyond the brief detention necessary to obtain his property and drive away in his vehicle." In contrast, the State contends that "by convicting Defendant Sims of especially aggravated kidnapping after receiving the *White* instruction, the jury made the factual determination that the removal or confinement of [Mr.] Mathis was to a greater degree than that necessary to consummate the aggravated robbery of his wallet, the contents of his wallet, his phone, and the contents of his vehicle as charged in the indictment." We agree with the State.

Especially aggravated kidnapping is a "false imprisonment . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to

reasonably believe it to be a deadly weapon." Tenn. Code Ann. § 39-13-305(a)(1). False imprisonment is the knowing removal or confinement of another unlawfully so as to interfere substantially with the other's liberty. *Id.* § 39-13-302(a). "When jurors are called upon to determine whether the State has proven beyond a reasonable doubt the elements of kidnapping, aggravated kidnapping, or especially aggravated kidnapping, trial courts should specifically require a determination of whether the removal or confinement is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support a conviction." *State v. White*, 362 S.W.3d 559, 578 (Tenn. 2012). In determining whether there is "substantial interference," our Supreme Court provided several factors to consider, including, but not limited to: "the nature and duration of the victim's removal or confinement by the defendant;" "whether the removal or confinement occurred during the commission of the separate offense;" "whether the interference with the victim's liberty was inherent in the nature of the separate offense;" "whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so;" "whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective;" and "whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense." *Id.* at 580-81. Whether the removal or confinement constituted substantial interference with the victim's liberty is a question of fact for the jury to resolve. *Id.* at 577.

Viewed in the light most favorable to the State, the evidence at trial showed that Defendant Sims and Defendant Terry brandished handguns and robbed Mr. Mathis of his wallet, cell phone, keys, and the contents of his vehicle. In doing so, the defendants approached Mr. Mathis's vehicle, knocked on the window, pointed a gun at him, and demanded he exit the vehicle and turn over his personal effects. When Mr. Mathis attempted to calmly resist, the defendants continued pointing their guns at him and ordered Mr. Mathis to the ground and not to move or speak or he would be shot. The defendants then entered Mr. Mathis's vehicle and attempted to drive away. However, because the vehicle required a specific method to start the engine, the defendants were unsuccessful. As such, the defendants ordered Mr. Mathis back into the vehicle and told him to start the engine, and Mr. Mathis complied. Mr. Mathis again exited the vehicle and got back onto the ground. The defendants drove away, and Mr. Mathis did not get up until they were gone.

Though Defendant Sims asserts the confinement was "brief," the statutory elements of especially aggravated kidnapping do not require a finding that the defendant moved the victim any specific distance or restrained him for any particular length of time in order for the defendant's actions to substantially interfere with the victim's liberty. *See State v. Antwon Young*, No. W2019-00492-CCA-R3-CD, 2020 WL 1491377, at *4 (Tenn. Crim.

App. Mar. 26, 2020), *perm. app. denied* (Tenn. Aug. 11, 2020). And, the record indicates the jury could have reasonably concluded that the removal or confinement reduced the defendant's risk of detection and prevented Mr. Mathis from summoning assistance as the defendants forced Mr. Mathis out of his vehicle and onto the ground at gunpoint and ordered Mr. Mathis not to move or speak. Accordingly, the removal or confinement of Mr. Mathis was to a greater degree than that necessary to commit the offense of aggravated robbery, and Defendant Sims is not entitled to relief.

### III.   Gang-Related Evidence

Generally, both Defendants Terry and Sims argue the trial court erred in allowing the introduction of gang-related evidence through the trial testimony of Co-defendant Marlin and Detective Walker in violation of Tennessee Rule of Evidence 404(b). The State asserts the trial court properly admitted the gang-related evidence pursuant to Rule 404(b) in order to show the defendants' intent and motive and to complete the story of their crimes.

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice is defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978) (internal quotation omitted). Further, "[p]rejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" *State v. Young*, 196 S.W.3d 85, 106 (Tenn. 2006) (citations and internal quotation marks omitted); *see also State v. Jeffrey Wooten*, No. E2018-01338-CCA-R3-CD, 2020 WL 211543, at *7-8 (Tenn. Crim. App. Jan. 13, 2020), *perm. app. denied* (Tenn. June 3, 2020).

Rule 404(b) of the Tennessee Rules of Evidence generally prohibits "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b); *State v. Jones*, 450 S.W.3d 866, 891 (Tenn. 2014). Rule 404(b) allows such evidence in limited circumstances for purposes other than proving action in conformity with a character trait. *Id*. "The terms of this rule establish that character evidence cannot be used to prove that a person has a propensity to commit a crime." *State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003) (citing *State v. Adkisson*, 899 S.W.2d 626 (Tenn. Crim. App. 1994)). However, the rule sets out certain procedural requirements the trial court must follow before admitting such evidence:

- 22 -

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4). "Other purposes" has been defined to include: (1) motive; (2) intent; (3) guilty knowledge; (4) identity of the defendant; (5) absence of mistake or accident; (6) a common scheme or plan; (7) completion of the story; (8) opportunity; and (9) preparation. *State v. Parton*, 694 S.W.2d 299, 302 (Tenn. 1985); *Bunch v. State*, 605 S.W.2d 227, 229 (Tenn.1980); *State v. Jones*, 15 S.W.3d 880, 894 (Tenn. Crim. App. 1999).

Trial courts are encouraged to take a "restrictive approach [to] [Rule] 404(b) . . . because 'other act' evidence carries a significant potential for unfairly influencing a jury." *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008). In *Dotson*, our Supreme Court explained the policy in favor of exclusion:

> The rationale behind the general rule is that admission of other wrongs carries with it the inherent risk of the jury convicting a defendant of a crime based upon his or her bad character or propensity to commit a crime, rather than the strength of the proof of guilt on the specific charge . . . . As this Court has consistently cautioned, the jury should not "be tempted to convict based upon a defendant's propensity to commit crimes rather than . . . evidence relating to the charged offense."

*Id*. (citing *State v. Spicer*, 12 S.W.3d 438, 448 (Tenn. 2000)). Provided the trial court substantially complied with the procedure of Rule 404(b), the trial court's decision to admit or exclude evidence will not be overturned on appeal absent an abuse of discretion. *Jones*, 450 S.W.3d at 891. A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008). If the trial court

- 23 -

failed to substantially comply with the strict procedural requirements of Rule 404(b), then no deference is given to the trial court's decision to admit or exclude evidence, and this Court will determine admissibility based on the evidence presented at the jury out hearing. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).

"[E]vidence of gang affiliation is character evidence subject to Rule 404(b)." *State v. Shasta Jackson*, No. E2014-01387-CCA-R3-CD, 2015 WL 6756318, at \*9 (Tenn. Crim. App. Nov. 5, 2015), *perm. app. denied* (May 5, 2016) (citations omitted). "As such, gang-related evidence 'may be relevant and admissible to prove issues such as identity, motive, opportunity, or absence of mistake or accident.'" *Id.*; *see* Tenn. R. Evid. 404(b).

In this case, the record indicates the trial court substantially complied with the requirements of Tennessee Rule of Evidence 404(b) and properly found the evidence was admissible to show the defendants' motive and intent for participating in the "randoms" against Mr. Mathis and Mr. Hutchins. Before Co-defendant Marlin testified, the trial court conducted a jury-out hearing on the admissibility of evidence relating to the defendants' memberships in the Rollin' 20's Crips, Co-defendant Marlin's membership in the Rollin' 40's Crips, the relationship between the two gangs, and Detective Walker's expert testimony regarding the Rollin' 20's Crips and the defendants' memberships in the gang. After considering the evidence and the arguments of the parties, the trial court provided the following reasoning for its admission of the gang-related evidence:

> All right. This is a very serious decision to have to make. We've got the idea of conspiracy, which is a difficult concept to apply in a lot of context. And it certainly drags in hearsay, which is also dangerous to play with. And we also have gang-related activity, which is dangerous in a trial, certainly very inflammatory and prejudicial. So the Court has to tread very, very carefully here.

> But it would appear our laws do permit the prosecution to introduce proof of a conspiracy, even when conspiracy is not the charge that's on trial. And if they're successful in doing that, then the conspiracy Rules of Evidence apply, which -- and what those rules are, that the hearsay statement of any member of the conspiracy, that's made in furtherance of conspiracy, is admissible against all the other codefendants -- or all the other participants in the conspiracy, I should say.

> In this particular case, the conspiracy -- the purpose of the conspiracy is to advance the cause of the gang. The -- it really doesn't make much sense to try to understand their actions, except within the context of gang-related activity. So the Court is going to have to let in most of this evidence.

Accordingly, the record indicates the trial court did not abuse its discretion when it allowed gang-related evidence and the defendants' gang memberships to be introduced at trial because the defendants' memberships in the Rollin' 20's Crips were relevant in order to establish a motive for the offenses and the defendants' intent in committing the crimes. *See State v. Orlando Crayton,* No. W2000-00213-CCA-R3-CD, 2001 WL 720612, at *3-4 (Tenn. Crim. App. June 27, 2001). It is clear throughout the record that the defendants and their co-defendants were committing random robberies in order to obtain money for Co-defendant Williams and the Rollin' 20's Crips. In doing so, the defendants robbed Mr. Mathis of his keys, wallet, cell phone, and the contents of his vehicle, and attempted to rob Mr. Hutchins which resulted in Mr. Hutchins's death. Co-defendant Marlin and Detective Walker's testimonies regarding the defendants' gang memberships were both corroborative and probative to establish the defendants' motive and intent in victimizing Mr. Mathis and Mr. Hutchins. This Court has repeatedly held that evidence of gang affiliation may be admissible to establish a defendant's identity, motive, or intent. *See State v. Cortez Lebron Sims*, No. E2018-01268-CCA-R3-CD, 2020 WL 5088737, at *9 (Tenn. Crim. App. Aug. 28, 2020), *perm. app. denied* (Feb. 4, 2021) (citations omitted). And, the record indicates the trial court substantially complied with the requirements of Rule 404(b) before permitting the evidence for other purposes. The defendants are not entitled to relief.

### IV.    Motion to Sever

Defendant Terry asserts the trial court erred by denying his request for severance from Defendant Sims after Defendant Sims's statement was introduced against him during trial and he was not afforded the opportunity to confront or cross-examine Defendant Sims. The State asserts Defendant Terry has waived this claim for failing to move to sever prior to trial. Also, the State argues Defendant Terry opposed the State's pre-trial motion to sever. Regardless, the State notes "[t]he record shows that the trial court admitted into evidence a highly redacted recording of Defendant Sims's police statement that did not refer to Defendant Terry" and as a result, "there was no *Bruton* issue and no error from the trial court's refusal to sever the defendants." We agree with the State.

This Court reviews a trial court's decision to grant or deny severance under an abuse of discretion standard. *State v. Dotson*, 254 S.W.3d 378, 390 (Tenn. 2008). A trial court abuses its discretion in denying severance if the record demonstrates "'the defendant was clearly prejudiced to the point that the trial court's discretion ended and the granting of severance became a judicial duty.'" *State v. Burton*, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988) (quoting *Hunter v. State*, 440 S.W.2d 1, 6 (Tenn. 1969)). Tennessee Rule of Criminal Procedure 14(a)(1)(A) provides the procedure for severance as follows: "A defendant's motion for severance of offenses or defendants shall be made before trial,

except that a motion for severance may be made before or at the close of all evidence if based on a ground not previously known. A defendant waives severance if the motion is not timely." *Id.*

Prior to trial, Defendant Terry objected when the State moved to sever the defendants in order to avoid any *Bruton* issues. The hearing on the State's motion resulted in only Co-defendant Williams's severance, and Defendants Terry and Sims proceeded to trial jointly. Though the record indicates Defendant Terry moved to sever numerous times throughout the trial, he failed to request severance before trial. As a result, Defendant Terry's many requests were untimely and are deemed waived on appeal. *State v. Calvin Person*, No. W2011-02682-CCA-R3-CD, 2013 WL 5883796, at *13 (Tenn. Crim. App. Oct. 31, 2013) ("The first time that [the defendant] raised the issue of severance was in his motion for new trial. Thus, we find that his complaint is untimely and, therefore, waived."), *perm. app. denied* (Tenn. March 5, 2014). Regardless of waiver, Defendant Terry is not entitled to relief as the record indicates the State introduced a redacted version of Defendant Sims's statement in order to avoid any *Bruton* issues, and Defendant Terry has failed to identify any portion of Defendant Sims's statement which violated the same. As such, he cannot establish he was "'prejudiced to the point that the trial court's discretion ended and the granting of severance became a judicial duty.'" *Burton*, 751 S.W.2d at 447. Defendant Terry is not entitled to relief.

### *Conclusion*

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
J. ROSS DYER, JUDGE